[No. 8810.]

## STATE BOARD OF CORRECTIONS ET AL. V. THE CITY AND COUNTY OF DENVER.

1. MANDAMUS—*Petition,* against a public officer must always show a good case; failing in this the writ will be denied, even though no answer is interposed. (274.)

2. —— *Discretionary Powers—How Far Subject to Judicial Control.* As to discretionary powers, while the officer may be commanded to act, the writ will not further control, or interfere with his action, or require him to act in any specific manner. (274.)

The court declined to accept the opinions of experts as to the sup-

posed unreasonable character of the rules adopted by the Board in control of the State Insane Asylum, or as to the means proposed for obviating and correcting the difficulties arising from the limited character of the accommodations of the asylum, declaring that all these matters were within the discretionary powers of the Board. (282-287.)

3. INSANE ASYLUM—*State Board of Corrections—Powers.* Under Rev. Stat., sec. 4152, the State Board of Corrections are vested with full power and discretion in the expenditure of the moneys appropriated by the Legislature, or otherwise provided, for the support and conduct of the Asylum for the Insane; and are empowered to adopt rules and by-laws for the management of that institution. (275.)

Their regulations must, as in every like case be reasonable, but the presumption always is that they are so. (278.)

4. —— *Rules of the Board.* The rule of the Board requiring the prorating among the different counties of the state, of the number of insane which shall be received into the asylum, according to the population of the counties respectively, and the capacity of the institution, sustained. (281.)

WHITE, J., concurred upon the ground that certain insane persons committed to the asylum by the County Court, and which the superintendent had refused to receive, were within the exclusive jurisdiction of that court, and that no other court had, or could have, any control over such person, or their custody.

5. —— *Superintendent.* By c. 177 of the Laws of 1899 (Rev. Stat., sec. 4154) the power to appoint the superintendent was taken away from the Governor and committed to the Board of Lunacy Commissioners. All previous legislation prescribing the duties of the superintendent was repealed, and his duties, are now, such as the Board may prescribe by its rules or direct in any particular case. (281.)

6. STATUTES—*Construction.* The law does not require impossibilities. All provisions in *pari materia* are to be taken together, and construed in the light of reason. (281.)

7. —— *Construed.* General words authorizing the courts to commit insane persons to the Asylum for the Insane (Rev. Stat., sec. 4129), were not intended to confer an arbitrary power to commit, without reference to the capacity of the Institution to receive such person. (281.)

8. APPEALS AND ERROR—*Opinions—Effect in Court of Review.* Mandamus to compel the superintendent of the State Asylum for the Insane to receive into that Institution certain insane persons committed thereto by the County Court. Answer that there were no accommodations in the asylum for said insane persons, no apartments where they could be received, accommodated and treated. The witnesses examined for the relator were of the opinion that proper and sufficient accommodations might, by changes suggested, be provided. The court below made the writ peremptory, and it was urged that the question being one of fact the court of review were concluded by

this finding.  This contention was rejected, the court holding that the testimony as to the matter was mere opinion, and the case was not within the ordinary rule.  (283.)

*Error to Denver District Court.*  Hon GEO. W. ALLEN, Judge.

Hon. FRED FARRAR, Attorney General, Mr. NORTON MONTGOMERY, Assistant Attorney General, for plaintiffs in error.

Mr. JAMES A. MARSH, Mr. CHARLES L. AVERY and Mr. WILLIAM R. KENNEDY, for defendant in error.

SCOTT, J., delivered the opinion of the court.

This is an action in mandamus to compel the authorities in control of the State Asylum for the Insane, to receive and care for certain insane patients from the City and County of Denver, lawfully adjudged insane, and now a charge upon the county.

The action is against the superintendent of the institution, and the Colorado Board of Corrections, charged by law with the conduct and management of the asylum.

It appears from the alternative writ made permanent on final hearing, that the sheriff of the county, acting under the proper authority and with proper commitments, proceeded to the asylum with certain persons adjudged to be insane, and that the superintendent of the asylum declined to receive such patients, and that the sheriff was compelled to return them to the custody of the county authorities. The specific complaint is as to four such patients, though there is a general charge as to many others.

The defense of the respondent officials, after the admission of the facts set forth in the petition, alleges:

1.  "That on or about the .. day of .......... and prior to the time when the respondents composing the Colorado Board of Corrections were appointed and qualified, it became,—by reason of the crowded condition of the insane

hospital at Pueblo and an excess of insane persons committed to said asylum over the physical possibilities of receiving, keeping and caring for such persons,—necessary to adopt rules and regulations concerning the admission of patients to the said asylum; that in pursuance of the said necessity, the Colorado Board of Lunacy Commissioners, which, at that time, was, under the statutes of Colorado, the board charged with the control and management of said State Insane Asylum, duly and legally passed reasonable and proper regulations for the admission of patients thereunder, and that said reasonable rules and regulations so passed are still in force and effect, and were in force and effect at all times subsequent to the adoption thereof and prior to the issuance of the alternative writ herein, and at the time of the issuance of said writ; that the said rules and regulations adopted by the said board were in the following words and figures:

"The superintendent is instructed to estimate the ratio of cases to which each county is entitled, basing such estimate on the capacity of the institution, and on the population of each county as shown by the latest United States Census.

In case of death or discharge he shall allot such vacancy or vacancies to such County or Counties, the number of whose inmates is below the estimated ratio, giving the preference to those counties who shall have on file with him the greatest number of commitments, except that he shall not allot to any one county more vacancies than the difference between the number of inmates from such county and the total of the ratio of that county.

If at any time no one of the counties whose number of inmates is below their estimated ratio, shall have on file any commitments, then, he shall assign such vacancies as may occur to other counties, receiving the patients in the order in which the commitments on file show them to have been adjudged.

The superintendent is further ordered to send a copy of these instructions to the County Judge of each and every county, together with a request that each County Judge file with the superintendent of the Colorado Insane Asylum a copy of the commitment, and judge's certificate, in each case that shall be committed as insane in their court, in order that the above plan may be carried out fairly in the case of all counties.

2. That in pursuance of the resolution aforesaid, the said superintendent made the estimate therein provided for, and that the said relator herein, prior to said time of the adoption of said resolution, and the making of the assessment therein provided for, and ever since said time, and to the present date, has had and has now in said State Insane Asylum the number of inmates to which the relator is entitled, and has had at all times and now has a few more inmates in the said asylum than it is entitled to under the said resolution, and under any fair and reasonable plan for the distribution of space in the said insane asylum among the counties of the State of Colorado which could be adopted; that at the time referred to in the said alternative writ, of the transportation of said four mentioned insane persons to Pueblo from the City of Denver, the superintendent of the State Insane Asylum had notified relator that he could accommodate five insane persons from the City and County of Denver, and that in response to his said notice as aforesaid, the said City and County of Denver sent nine insane persons to the said institution, and the said superintendent under the said resolution, rules and regulations aforesaid, could only accommodate and care for five thereof; that at said time the said superintendent of the said asylum accepted five of the nine so sent to the said asylum, and refused to accept four thereof under, and by virtue of the authority of the said reasonable rules and regulations so adopted as aforesaid.

3.    That the physical capacity of the insane asylum at Pueblo is 1190 patients of all ages and of both sexes; that the said asylum was, at the times mentioned in the alternative writ of tender of the said named insane persons, and now is, filled to its full capacity; that at that time it was impossible for the authorities in charge of said insane asylum to accept or care for any more patients than they did have; that there were, at that time 1190 insane inmates of the said insane asylum, which said number was all for which the State of Colorado had made and has made provision, and there was no room for any further or additional inmates at said time, and that because of these things and matters and the physical limitations of the said hospital and insane asylum, the said superintendent at the said time and place refused to accept the said four named persons, and for no other reason.

4.    That respondents, nor no other person, have any legal authority to arrange for the care of insane persons committed to the State Insane Asylum in any other place or places than the insane asylum itself, and that they have no funds and have never had any funds for making any other or further arrangements, and that for this reason they did not make any further or other arrangements for caring for said four named persons or any thereof, and they cannot do so until the legislature of the State of Colorado, in its wisdom, sees fit to provide therefor.

5.    That they are informed and believe that there are, in the State of Colorado, situated in the same manner as the four insane persons set out and referred to in the alternative writ, approximately three hundred and twenty-five insane persons, distributed throughout the various counties of the said state, and being cared for in the various counties; that said number makes an excess of such number of insane persons over and above the physical capacity of the Colorado State Insane Asylum.

6.    That there are at present in process of construction and which will be finished some time next summer, three additional and new cottages, for the reception of insane persons properly committed, and that by statute the number of inmates of each of said cottages must not exceed one hundred, and that upon completion of said three cottages or any one thereof, respondents can then receive in the said State Insane Asylum other and additional patients and inmates further than they now have therein, but that until the completion of at least one of said cottages, the said excess of insane persons over the capacity of said institution will continue, in all probability, to be said sum of three hundred and twenty-five.

7.    That respondents are ready and willing, and have at all times been ready and willing, to receive and care for all the patients and inmates in the State Insane Asylum which the physical capacity and limitations thereof will permit, and that the refusals to receive the said patients and inmates alleged and set forth in the alternative writ were because of and are because of the lack of physical room to receive the said patients and inmates, and that there will continue to be such lack of capacity for some time to come.

8.    That respondents are, at all times, ready and willing to accommodate, care for and receive all insane persons properly committed to said state asylum which the physical capacity of the said institution and the funds devoted to the care and maintenance thereof will permit to be received and properly cared for; that it is impossible now, and was at the time the said four named insane persons were tendered, and has ever since said time been impossible for respondents to receive the said so tendered persons or any thereof and properly care for and maintain them or any thereof.

9.    They deny that they have ever, at any time, re-

fused or neglected to perform any duty by them required to be performed, and they allege that, at all times, they have been and now are willing to receive and care for, under proper rules and regulations which may be lawfully adopted for the maintenance and operation of the said state asylum, all patients and inmates which the physical capacity of the said institution and the funds appropriated by the state therefor will permit.

10.   That at no time set out and referred to in the alternative writ has there been, nor is there now, any appropriation of public funds made by the properly constituted authorities of the State of Colorado or otherwise, which can be used in the support and maintenance of insane persons committed to the said state asylum, and being cared for in private families or any other institutions; that respondents have no funds which can be used for such care and maintenance, and that therefore they have made and can make no such arrangements for such care, and there is no legal duty devolving upon them or either of them so to do."

These defenses were put in issue by the reply, a hearing was had, and the writ made peremptory.

It is contended by the Attorney General at the outset, that mandamus is not the proper remedy in such a case.

Assuming, for the purposes of this case only, that the action is a proper one, and without discussion or determination of that question, we determine the issue upon its merits.   This, because of the very great importance of the question to the state, to the management of the institution, to the insane, and to the several counties.

It is well to consider certain well settled rules of law in relation to a proceeding in mandamus, and particularly as relating to public officials.

It was said by this court in *Swanbeck v. People,* 15 Colo. 68, 24 Pac. 576: "It is always true that in an applica-

tion for mandamus against a public officer, the relator must show a good case upon the face of his petition, failing to do this, he would not be entitled to the writ, even though no answer whatsoever had been made to the application." And by Mr. High in his work on Extraordinary Legal Remedies, § 34:

"An important distinction to be observed in the outset, and which will more fully appear hereafter, is that between duties which are peremptory and absolute, and hence merely ministerial in their nature, and those which involve the exercise of some degree of official discretion and judgment upon the part of the officers charged with their performance. As regards the latter class of duties, concerning which the officer is vested with discretionary powers, while the writ may properly command him to act, or may set him in motion, it will not further control or interfere with his action, nor will it direct him to act in any specific manner." *People ex rel. v. County Commissioners,* 53 Colo. 494.

Section 4151 Rev. Stat. 1908, provides: "That the management of said asylum shall be vested in a state board of lunacy commissioners (now the Colorado Board of Corrections).

Section 4152 provides:

"The Board of lunacy commissioners shall have full control and supervision of all the property and over the grounds and buildings of the institution, and shall have the entire government and management of the same.

They shall prescribe and publish all rules and by-laws for the management of the affairs of the asylum and its inmates, and for the government of its officers and employes, and shall make proper provision for the reception, treatment, discharge and transfer either from or to other institutions, or from the asylum to family care, and the return therefrom of all inmates who may be committed to the asylum, and said board shall keep in a book provided for that purpose a full and complete record of their acts and

doings as such commissioners, in which book, among other things, shall be kept the date of each visitation of the asylum by the board in a body, or by individual members thereof, and the general condition of the asylum and its inmates."

Manifestly the legislature could not, and did not intend to provide rules in detail for the management and control of the asylum, and very properly, as it is the universal custom, vested such power in its board of management.

The statute reserves no act of management or control. The board is clearly vested with full power and discretion in the matter of the expenditure of all moneys appropriated by the legislature or otherwise provided by law, for the conduct of the institution. The broad language of the statute clearly grants a reasonable and wide discretion in the board as it relates to the buildings and other property. It vests "full control" and "full supervision" and the "entire government and management" of the same. Indeed, the only limitation placed on the board in this respect is that the buildings "shall be of moderate size on the 'Cottage plan,' " and that each building shall be designed to accommodate not less than fifty nor more than one hundred patients.

With this exception, the board is not only vested with a wide discretion, but the sole discretion to design, construct, supervise, control and manage all buildings of the institution, limited only to the funds appropriated for such purpose, or where a specific purpose may be designated.

The statute further confers upon the board, power, not only to make rules, but "all rules" and "all by-laws" for the management of "the affairs of the asylum" and "the affairs of its inmates," and "shall make proper provision for the reception, treatment, discharge, transfer, etc."

It would seem that language could not make plainer the intent of the legislature to vest the widest discretion in all

such matters.  What more sweeping and complete expression to confer discretionary power, than "management of, the *affairs* of the asylum and its inmates."  Webster defines the word "affairs" as, "That which is done or is to be done."  This must apply to all the affairs of the institution, for no one of such affairs is elsewhere entrusted.

It is true that the board must act within the appropriations by the law making power.  But the conduct of the institution is plainly within the reasonable discretion and judgment of the board.

There appears to be but few adjudicated cases bearing upon the character of case under consideration, and none are cited which seem to sustain the contention of the defendant in error.

Considering the question of the discretion of a lunacy board, we are aided by the case of *People v. Manhattan State Hospital,* 39 N. Y. Supp. 158.  That was an action in mandamus to compel the board to receive a patient whom the superintendent had declined to receive, as not having complied with the sanitary rules provided by the board, in that the patient was not dressed in a new suit of clothes, the purpose of the rule being to avoid infection.  The rule of the board in that case was:

"Considering the great danger always present of the introduction of contagious or infectious diseases into institutions where large numbers of people are congregated, and to avoid so far as possible the introduction of such diseases by means of wearing apparel, the clothing above provided for must in all cases, be new."

The court said:

"But, wherever the legislature has devolved upon any officer, municipal or otherwise, the duty of making regulations or ordinances with regard to the performance of public duties, it is essential to the validity of those ordinances that they should be reasonable; and, unless they are reason-

able, they are not valid, and are not enforceable. *City of Boston v. Shaw*, 1 Metc. (Mass.) 130. Whether the regulation established be a by-law or an ordinance of a municipal corporation, or a regulation established by some official board, having by authority of the legislature jurisdiction to make regulations upon a special subject, the rule is the same; and it is laid down that such ordinances or regulations must be reasonable, not inconsistent with the laws or policy of the state, and consonant with the purposes of the institution for which they are made. Dill. Mun. Corp. § 319; Cooley Const. Lim. marg. pp. 200, 201. The question presented here, then, is whether or not this regulation was a reasonable one; for, if it was, the superintendent of the state hospital was bound to obey it, and he was justified in refusing to receive O'Donahue. -* *' * It is made to appear, by the affidavits of Dr. Howard, of Dr. Pilgrom, and other superintendents of the state hospitals, that the rule requiring new clothing has been rigidly enforced, and the existence of it throughout the state generally is quite material to the safety of the inmates of the state hospitals. These gentlemen are men of recognized ability and large and varied experience in this matter, and their testimony upon this question of fact is to be highly considered. In addition to that, it is made to appear that the number of inmates in the various hospitals is over 19,000, of which 6,800 and upward are in the Manhattan State Hospital; and it is stated (what might be easily appreciated, although it had not been shown) that the introduction of contagious or infectious diseases into any one of these hospitals, in which such great numbers of these poor people are collected, would produce the most serious consequences. None of these facts are denied. It is true that the eminent professional gentlemen who have made affidavits in behalf of the relator have sworn that in their judgment this regulation is 'unreasonable,' 'absurd,' 'void,' "without authority of

law,' and have applied to it other epithets more or less strong which have occurred to them upon the subject. But these epithets, however convincing they may be as expressing the opinion of the affiants, are still only opinions, and not statements of facts, and can aid us in deciding as to the reasonableness of these regulations only so far as the opinion of experts can be considered upon such questions. None of them change the facts, nor do they raise any disputed question of fact upon the subject.

The question, then, stands to be decided as a question of law, upon a consideration of everything which has been made to appear in these papers. When that is considered, the presumption in the first instance always is that the regulation is reasonable. *Com. v. Patch,* 97 Mass. 221. In examining the question it must be considered, in the first place, that it is a general regulation for the whole state. There is no question that some regulation is absolutely necessary which shall prevent the introduction of contagious or infectious diseases into these places, where great bodies of people are closely congregated, many of whom are unable to care for themselves. * * * It is said that some other method may be equally good, but the fact that that is so, does not render the regulation which adopts this particular method either unreasonable or improper. If the regulation is within the power of the president of the state commission, as it is; if it is adapted to its purpose, and one which might under any circumstances be made, —then within the rule that all presumptions are in favor of the validity of such regulations, it must be adjudged to be reasonable, unless the contrary is made to appear."

The case of *Rutter v. State,* 38 Ohio St. 496, was an action in mandamus to compel the superintendent of an asylum, to return to the asylum a patient, wife of the petitioner, whom the superintendent had permitted to be taken beyond the limits of the state. It was contended that such

action was not contemplated by the statute, and, that there was no such discretion resting in the superintendent, or in the board, to make such a rule. The court said:

"A patient may be discharged from an asylum for the insane upon the application of the superintendent to one of the trustees, and order of such trustee. Rev. Stats. § 709. 'If the friends of a patient ask his discharge from the asylum, the superintendent may require a bond to be executed to the state, in such sum and with such sureties as he deems proper, conditioned for the safe keeping of such patient." Rev. Stats. § 717. Other provisions relate to the powers and duties of the trustees and officers of such institutions; but it was obviously impossible to provide in detail for the management of such asylums, and hence it is provided that the board of trustees shall establish such rules and regulations as may be deemed expedient for the government of such hospitals. * * * In no respect is the advance in civilization exhibited in a more marked degree than in the treatment of the insane. The harshness to which this unfortunate class was formerly subjected was in many cases revolting. But in this respect there has been a revolution, and the inmates of insane hospitals are now, as a rule, treated with kindness and a human regard for their welfare. * * * Construing the statutes relating to asylums and the insane in the liberal spirit in which they were enacted, and viewing the question before us as simply one of power, we are of opinion that the law places no such restriction as that claimed, on the authority of the superintendent."

It is contended by the city and county, that sec. 2 of the act of 1879, provided that: "The superintendent of the institution 'shall receive and discharge' all persons placed in charge of the asylum under the provisions of this Act." That therefore, it is his duty to receive all patients sent to the institution regardless of capacity, welfare of the

patients, or the rules of the board. But, even if the argument could have weight when such was the law, it cannot be considered now.

By the Act of 1899, Chap. 117, section 2 of the Act of 1879 was expressly repealed. The power to appoint the superintendent was taken from the governor and bestowed upon the board, and it was provided that such officer should hold his office at the pleasure of the board. By that act all prescribed duties of the superintendent were repealed and his duties were to be such only as directed by the board and prescribed by its rules. By that act and in this particular, the board was thus given greater power, judgment and discretion, in the control and management of the institution, its officers and its inmates; and the affairs of the asylum and its inmates was placed within the sole control of the board.

It is further contended that the county court is clothed with the power to commit convicted insane persons to the asylum, or to other places of confinement, and, having issued its order of committment of the persons here involved, that the authorities at the asylum may not disregard such solemn order of the court and command of the writ, by refusing to accept the persons thus tendered to him.

The law does not require that which is impossible, and its provisions relating to the same subject-matter must be construed together in the light of reason and judgment, so as if possible, to effect the intent and purpose of the legislature. It cannot reasonably be said that the legislature intended to confer upon courts the arbitrary power to compel the admission of patients to such an institution, without capacity to receive them, or without the means to care for them, regardless of the welfare of the inmates in the institution, or those sought to be admitted.

If the buildings and equipment of the asylum were to be burned, the power of the courts, would still exist, and

under the contention of counsel, the superintendent would be compelled to receive additional patients, notwithstanding there was no place for them; or that the twelve hundred so deprived of shelter and care, were without place to lay their heads.

It is an ancient saying that the law is founded on reason, and once we admit the principle of reason in such an extreme case, we must admit it in any case where reason and judgment are to be exercised.

We now come to the question a to whether or not the board in refusing to receive the patients, acted within a reasonable rule.

It is said by counsel that the hospital of the City and County, where its insane patients are kept, is badly overcrowded, and that it has been necessary to keep these insane patients under conditions which are unfavorable to their comfort, health and chances of recovery, and which from every point of view, are deplorable. Whatever may be the condition of the county hospital, it cannot be considered in determining the question of the power of the Board of Corrections, to exercise discretion and judgment in receiving patients into the asylum, or in the conduct of the affairs of that institution otherwise, which is the matter before us.

Witnesses for the city are of the opinion that suitable arrangements can be made at the asylum for Denver County's insane. But the testimony discloses that there are in the state about three hundred and thirty-five insane persons for whom admittance to the asylum under equal right, may be asked. If the insane of Denver are admitted under the command of the court, then, upon request it must compel the admission of the entire three hundred and thirty-five.

Certainly there is no showing that this is possible without producing like conditions as now obtain in the county hospital, and this of necessity, would affect the present inmates and all other insane, which appear to total fifteen

hundred and twenty-five persons. Is it reasonable or just, to ask the court to relieve the situation in Denver, when the result is likely to produce a like or worse condition among the insane of the state? Can the law making power have ever contemplated such a result?

It is urged that the question of how many insane may be properly accommodated at the asylum, is a question of fact to be determined by the court, and that the trial court having determined this question of fact, this court may not under its rule, disturb such finding. This is not tenable. Naturally and reasonably the question of capacity of existing buildings and equipment, is one to be determined by the board, charged with that duty, and having due regard to all the insane of the state, and not those alone of any one county.

While witnesses appearing on both sides of this case have testified to contrary opinion, yet this constitutes no more than opinion, and the question of what one or more experts may think about it, or the weight of opinion on that subject, is not to be considered, but rather whether or not the rules of the body charged with the responsibility are reasonable.

'Considering the suggestion of counsel as to the manner in which more patients may be accommodated, it is said that in each of the wards there is a rest room, and that in many of these rest rooms, beds could be placed for the accommodation of patients. There is no testimony that a rest room is not proper or necessary for the treatment of such patients. Counsel suggest that the corridors could be used for rest rooms. It is well known that the corridors are used for exercise, freedom of action, for better light and air, and that necessarily large numbers of patients must be gathered in the corridors at the same time. What can we say of the result of the attempt to give rest and quiet to an excited or sick insane patient, in a corridor surrounded by a large

number of other insane persons, equally liable to become excited, noisy and demonstrative. The mere suggestion is sufficient proof of its absurdity.

Again, it is said that there are various sleeping rooms which accommodate from one to four patients, and that these do not accommodate as many patients as they should, and that some rooms do not accommodate as many patients as others of the same size. Who can be the judge as to all this, except those who are skilled in the treatment of the insane, and who are acquainted with the individual patients, with knowledge of the peculiar nature of the malady as it affects each particular patient, and who bear the responsibility of the duty imposed?

Can it be said that courts are to determine as to this upon the testimony of those skilled or not skilled, experienced or not, in the treatment for insanity?

Again, it is charged that there is a building known as an amusement hall, a one story building with a basement; that the main floor is equipped for an amusement hall, and the basement is used for storage purposes, and it is urged that both the main floor and the basement could be used for sleeping rooms.

The superintendent testifies that he knows of no asylum in the country that does not have an amusement hall, and that the basement is not fit for the housing and sleeping of patients. He further testifies concerning the uses of this hall, that "The amusement hall is used every Friday morning for a moving picture show, and every Wednesday night for a dance; every Sunday afternoon for religious services, and at least once a month on Sunday morning for religious services; I consider a building for amusement purposes an absolute necessity; there is no water in the amusement hall, and there are no lavatories or plumbing connections there; the basement of the amusement hall is used for a store room; at the present time we have no other store room that we could use."

Besides, the legislature, presumably in recognition of the universal use and beneficial results, made the appropriation for, and authorized the erection of this amusement hall. Such a place is but one of the many improvements and advances in the methods of humane treatment of the insane. It does not require the testimony of an expert to show that religious service, music and dancing, and other entertainments so provided, tends to the peace, quiet and contentment, if it does not aid in the cure of those curable.

It is true that the building may be remodeled and fitted up for sleeping rooms, but shall the court declare against the expressed purpose of the legislature, and the experience of years, resulting in a policy so universally adopted, in order that some one or more of the counties of the state may be relieved of a responsibility which may be present and temporary burden?

Again, it is said that some of the basements of cottages can be fitted up for sleeping rooms. Perhaps this is true. But basements and cellars are not usually constructed for the purpose of sleeping apartments, even for those in good health.

Clearly, the legislature did not intend that the diseased and afflicted wards of the state should be housed in places, which its officers charged with the duty of management and care of such persons, declare to be unfit, and not conducive to their comfort, health or possible cure. The suggestion is repugnant to every sense of duty and propriety.

It is urged that the board is not bound by the legislative provision, that cottages shall be constructed so as to accommodate not less than fifty patients, nor more than one hundred. But we cannot agree that this provision was meaningless.

Students of the subject must agree that in the policy of treatment of the insane, smaller buildings are advisable, and even necessary for humane treatment. The purpose

is to avoid the assembling of large numbers of insane persons in the same building, which very naturally tends to increased excitement, and irritation to diseased minds; for better light and ventilation necessary to health; and to decrease the risks from fire or other calamity. It is plain that the legislature had in mind the spirit of the time, and so intentionally placed this limitation on the powers of the board. Indeed, large tracts of land, and small inexpensive cottages, where patients can have the advantage of the open air, with opportunity to cultivate gardens of vegetables and flowers, is now believed strongly tends toward contentment and health, and to the restoration of reason, in curable cases. Indeed, it is significant that the superintendent testified in this case, that seventy-five per cent of the patients in the asylum are able to work and can be entrusted to do so.

It is clear that the legislature has placed a very wide discretion and judgment in the board of corrections, in the control and management of the affairs of the asylum and its inmates.

The consensus of judicial opinion as to the duty of courts in such cases, seems to be well stated by Mr. High, as follows:

"That rule is, that in all matters requiring the exercise of official judgment, or resting in the sound discretion of the person to whom a duty is confided by law, mandamus will not lie, either to control the exercise of that discretion, or to determine upon the decision which shall be finally given. And whenever public officers are vested with powers of discretionary nature as to the performance of any official duty, or in reaching a given result of official action, they are required to exercise any degree of judgment, while it is proper by mandamus to set them in motion and to require their action upon all matters officially entrusted to their judgment and discretion, the courts will in no manner interfere with the exercise of their discretion, nor attempt by

mandamus to control or dictate the judgment to be given. Indeed, so jealous are the courts of encroaching in any manner upon the discretionary powers of public officers, that if any reasonable doubt exists as to the question of discretion or want of discretion, they will hesitate to interfere, preferring rather to extend the benefit of the doubt in favor of the officer." High's Extraordinary Legal Remedies, (3d ed.) § 42, p. 50.

It is plain from what appears here, that the failure of the state to properly and sufficiently provide for the insane, is greatly to be deplored, but the remedy lies with the law making power, therefore the appeal for relief should go to the legislature. Every instinct of humanity appeals to the conscience of the legislator, and the constitution commands it. Art. 8, § 1, Constitution.

It may be said however, that it appears that the board is now constructing three new cottages, and that it is expected these will be completed about August 1st, 1916. Further, that the additional capacity of these three buildings, together with certain alterations in the administration building, will provide for from three hundred and forty to three hundred and fifty additional patients. So that the stress of the present situation will be greatly relieved at that time.

It should be remembered that but a small per cent of those declared to be insane are ever cured, and thus, the great body of those sent to asylums must remain for the remainder of their natural lives, with the number of insane constantly and rapidly increasing, differing in this respect from those sent to prisons where the terms of confinement are generally for short periods of time.

The judgment is reversed with instruction to dismiss the proceeding.

*En Banc.*

Mr. Justice WHITE concurring.

This is an action in *mandamus* prosecuted by the City and County of Denver against the Colorado Board of Corrections, charged by law with the conduct and management of the State Insane Asylum, and the Superintendent of such institution. The purpose of the action is to compel the respondents to receive and admit into the State Insane Asylum certain persons from the City and County of Denver who have been adjudged insane and ordered to be taken to such institution and confined therein by the County Court of such county. The proceedings disclose that in each case a *mittimus* was issued by the County Court directing and commanding that such insane person therein named be taken by the sheriff of the City and County of Denver and delivered to the State Insane Asylum, and by it received and kept therein according to law; that respondents declined and refused to accept and receive such persons, and they remain, and now are, in the custody of the sheriff of the City and County of Denver and are charges upon such corporate entity, and the judgments and orders of the County Court have never been carried into effect. An alternative writ of *mandamus* was issued and served upon respondents, whereupon they, thru the Attorney General, answered thereto, setting forth that *mandamus* was not an appropriate remedy and that respondents were public officials vested with discretion and judgment in relation to the admission of those adjudged insane and ordered confined in such institution, and that the crowded condition of the institution would not permit the reception of a greater number of insane persons  Upon hearing, the alternative writ was made permanent and the respondents have brought the matter here for review on error.

The management of the State Insane Asylum is vested in the Colorado Board of Corrections. This board has full control and supervision of the property, grounds and buildings of the institution and entire government and manage-

ment of the same, and is required to prescribe and publish rules and by-laws for the management of the affairs of the asylum and its inmates, and for the government of its officers and employees. It is also required to "make proper provision for the reception, treatment, discharge and transfer either from or to other institutions, or from the asylum to family care, * * * of all inmates who may be committed to the asylum, * * *." § 4152 R. S. 1908; Chap. 52, p. 153, S. L. 1915. The County Court is authorized to commit a person adjudged to be a lunatic to the State Insane Asylum or any other hospital or place suitable for the treatment of the insane, or in case such person is not dangerously insane to order such mental incompetent to be placed in the custody of some friend or relative who will assume his custody or care. §§ 4127, 4129, R. S. 1908; § 7, chapter 118, pp. 336, 340, S. L. 1915. Under these statutes it may be, as claimed by relator, that an imperative duty rests upon the Colorado Board of Corrections to accept and receive into the State Insane Asylum all lunatics that the County Court orders to be confined therein, and, if circumstances arise requiring it, to arrange for the care in other places of persons committed to the asylum who cannot properly be cared for therein. Whether this be the correct view of the matter is, however, of no consequence herein, and I express no opinion thereon. Without regard to what discretionary power, if any, the board possesses, I am certain that *mandamus* should not have issued against respondents; and, furthermore, that the District Court had no power in the premises. An inquisition in lunacy is necessarily against the person of the party charged with insanity who is in custody of the law until the judgment of that tribunal is executed or discharged. §§ 4127, 4129, R. S. 1908, *supra;* chap. 118, S. L. 1915, *supra.* The judgments and orders to be carried into effect are those of the County Court, and it is orders of that court that are asked to be enforced here-

in. It is, therefore, very certain that such insane persons are in the custody of the County Court, and that no other court, unless thereunto specifically authorized by law, may interfere with such custody, if the proceedings were not void. The duty of executing its judgments rests solely upon the County Court. Until received into the insane asylum or the judgments of the County Court are carried into effect, suspended or discharged, such lunatics are within the control and jurisdiction of that court. Furthermore, no other court, after it is judicially informed that such persons are so held, has any right to interfere. The strict observance of this rule is essential to prevent confusion and conflict of jurisdiction; and to insure the due administration of justice. Indeed, it is elementary that a court having possession of a person or property cannot be deprived of the right to deal with such person or property until its jurisdiction is exhausted, and that no other court has the right to interfere with such custody or possession. 11 Cyc., p. 1006, par. 5; *In re. Johnson,* 167 U. S. 120, 125, 42 L. Ed. 103, 17 Sup. Ct. 735; *Ex Parte State,* 150 Ala. 489, 497, 43 So. 490, 10 L. R. A. (N. S.) 1124; *Ex Parte Bushnell,* 8 Ohio St. 599, 601, 124 Am. St. 79.

The fact that this point is not directly discussed in the briefs is not controlling. The whole facts disclosing the nature of the proceedings in the County Court, the judgments entered therein, and the writs to the sheriff issued thereon, and the action of the respondents in the premises, are disclosed in the petition and the alternative writ; and the relator has not shown a good case upon the face of its pleadings. It has, therefore, failed to set forth facts sufficient to constitute a cause of action, and was not entitled to the writ, even though respondents had not appeared. Clearly, unless the petition shows a clear right to the writ, no court has the power to either order or uphold it when

issued.   The principle is stated in *Schwanbeck v. People,* 15 Colo. 64, 68, as follows: "It is always true that in an application for a *mandamus* against a public officer, the relator must show a good case upon the face of his petition; failing to do this, he would not be entitled to the writ, even though no answer whatsoever had been made to the application."   The judgment should, therefore, be reversed and the cause remanded with directions to the District Court to discharge the writ, and dismiss the proceedings.

Chief Justice GABBERT dissenting.

In my opinion the only question is, whether the board is vested with discretion to refuse admittance to persons committed to the asylum.   If it is, then its refusal to accept such persons cannot be controlled by mandamus, and the judgment of the District Court should be reversed.   On the other hand, if it is not clothed with such discretion, the judgment should be affirmed.   The majority opinion construes section 4152, Rev. Stat. 1908, as authorizing the board to prescribe rules limiting the number of insane persons to be received at the asylum. : In my judgment the statute is not susceptible of that construction.   It does vest the board with control and supervision over the grounds and buildings of the institution, to make and publish rules for the management of the asylum and the reception, treatment and discharge of inmates, but this does not authorize any rule regulating the number of persons to be received therein or prorating its capacity among different counties. When section 4152 is considered in its entirety, is is manifest that the board cannot refuse to receive insane persons upon the ground of want of room.   It provides that the board "shall make proper provision for the reception, treatment, discharge and transfer, either from or *to other institutions,* or from the asylum *to family care,* * * * of all inmates who may be committed to the asylum."   The object .

in providing for the transfer of the insane to other institutions, or family care, was to enable the board to make provision for the care of insane persons, when the institution proper did not afford sufficient room for that purpose. Neither does the statutory provision to the effect that cottages shall be constructed to accommodate not more than one hundred patients vest the board with any discretion on the question involved. No doubt it may be advisable to have not more than one hundred patients under one roof, but this does not inhibit the board from placing more than that number in a cottage if the want of accommodations require it.

The asylum is a state institution, and the purpose of, making provision for the care of the insane was to accommodate all insane persons legally committed to it. The accommodations may not be sufficient, but that is not a question which the law has authorized the board to determine. That body must do the best it can with the facilities furnished, and, if they are not ideal, or are insufficient, the power to correct this condition is in the hands of the general assembly

If the number of patients to be received at the asylum can be fixed by the board in the exercise of its discretion, where is the line to be drawn? It cannot be controlled by mandamus, and the result now is and will be in the future, that whether the buildings are sufficient to accommodate additional persons will rest with the board, when, as the law unmistakably requires, it is their duty to receive and care for all insane persons committed to the asylum.

In my opinion the judgment of the District Court should be affirmed.

Mr. Justice TELLER concurs.

Decided April 3, A. D. 1916. Rehearing denied May 1, A. D. 1916.