**CHERRY HILLS RESORT DEVELOP-MENT COMPANY, a Colorado limited partnership, Temple H. Buell, as Trustee and Beneficiary under the Temple H. Buell Trust, and Richard L. Nathan, as Trustee under the Temple H. Buell Trust, Petitioners,**

v.

**The CITY OF CHERRY HILLS VILLAGE; The City of Cherry Hills Village City Council; Robert St. Clair, Roy A. Watts, Theodore B. Washburne, George Anderman, Ann M. Plumbus, Donald J. Egan and Merle Chambers, as present members of the City of Cherry Hills Village City Council, Respondents.**

No. 88SC502.

Supreme Court of Colorado,
En Banc.

April 30, 1990.

Holme Roberts & Owen, Lawrence L. Levin and Larry S. Schwartz, Denver, for petitioner Cherry Hills Resort Development Co.

Greengard & Senter, Richard D. Greengard, Denver, for petitioners Temple H. Buell and Richard L. Nathan.

Morris, Lower & Sattler, Robert L. Morris and P. Kathleen Lower, Denver, for respondents.

Justice ROVIRA delivered the Opinion of the Court.

Petitioners, the developers of real property in the City of Cherry Hills Village, seek review of the court of appeals determination in *Cherry Hills Resort Development Co. v. Cherry Hills Village*, No. 83CA0428 (Colo.App. Aug. 25, 1988) (not selected for publication), that (1) the zoning classification in which the property is located precludes the construction of condominiums, and (2) review of the remaining conditions imposed by the Cherry Hills City Council would be premature. We hold that the court of appeals erred in interpreting the zoning ordinance and in failing to address the additional conditions imposed on the development of the property, and accordingly, we reverse and remand with directions.

I

This dispute involves the development of a 68.8 acre parcel of property in the City of Cherry Hills Village (City). In 1957, Temple Buell owned approximately 116 acres of land at the corner of Hampden Avenue and University Boulevard. This land was zoned R–1, a residential district with a minimum lot area of 2½ acres for single family dwellings. Buell proposed to the City the construction of a "residential and resort hotel" complex which would include the development of a luxury hotel, residences, a lake, golf course, shops and other amenities. As a result, 68.8 acres of Buell's land was rezoned to RA–1, which permitted the land to be used for a "residential and resort hotel" and any other use permitted in an R–1 residential district.

The proposed complex was never constructed. In 1980, the Cherry Hills Resort Development Company (Developer) entered into an agreement with the Temple H. Buell Trust (Trust) to lease and develop the property. In July 1982, the Developer submitted two alternative development plans to the Cherry Hills Village City Council (city council). The plans were identical except that the first plan required the City to permit a golf course on a portion of the property zoned R–1 or to rezone that area as RA–1. The second plan placed the golf course in a portion of land which was already zoned RA–1, thus requiring no further zoning action. Both plans proposed a 600 room hotel and a 200 room structure or structures committed either to condominiums or apartments.

In September 1982, the city council passed a resolution approving the second development plan, but made its approval subject to twenty restrictions and conditions. Two of these conditions completely eliminated the proposed construction of luxury condominiums or apartments. The remaining conditions placed significant limitations on the development of the proposed hotel and surrounding grounds.

In October 1982, the Developer, Buell, and the trustees for the Trust filed a complaint in the Arapahoe County District

Court. The complaint contained five counts: (1) a request for certiorari review, pursuant to C.R.C.P. 106(a)(4), of the conditions and restrictions imposed by the city council; (2) a procedural due process claim; (3) a request for declaratory judgment; (4) an inverse condemnation claim; and (5) a claim for damages. In September 1983, the district court dismissed counts 3, 4, and 5 of the complaint, and directed briefing only on count 1. In March 1984, the district court ruled in favor of the plaintiffs on count 1, ordering the city council to delete or modify fourteen of the conditions. The court held that by imposing these conditions, the city council exercised discretion not afforded to it under the City's zoning ordinances, thereby exceeding its jurisdiction. The court entered a final judgment pursuant to C.R.C.P. 54(b), and the City appealed.

In February 1986, the court of appeals held that the district court lacked jurisdiction to review the city council's resolution because the council was not acting in a quasi-judicial capacity in adopting the resolution. *Cherry Hills Resort Dev. Co. v. Cherry Hills Village*, 720 P.2d 992 (Colo. App.1986). We reversed, holding that the district court had jurisdiction under C.R. C.P. 106(a)(4) to review the city council's decision. *Cherry Hills Resort Dev. Co. v. Cherry Hills Village*, 757 P.2d 622 (Colo. 1988).

On remand, the court of appeals held that the city council properly interpreted its zoning ordinances to preclude use of the subject property for condominiums. The court declined to address the remaining eighteen non-condominium conditions on the ground that it would be premature.

## II

The city council imposed two conditions as part of its approval of the development plan which, in effect, prohibited the Developer from building the 200 unit residential portion of the proposed residential and resort hotel complex. Condition I states that "[t]his preliminary approval is granted with the specific understanding and condition that the City's current Zoning Code does not permit for this project condominiums, timesharing units, luxury residences, or other long-term arrangements in the sense of continuous year-round tenancy." Further, condition K mandates that "[t]he entire project shall not exceed 600 hotel units totaling a maximum 620,000 square feet."

The trial court held that these conditions conflicted both with the City's zoning regulations and the Colorado Condominium Ownership Act, §§ 38–33–101 to –112, 16A C.R.S. (1982), and thus constituted an abuse of discretion. The court of appeals reversed, holding that because condominium ownership concerns residents who are predominantly permanent in the sense of continuous year-round tenancy, the condominiums were prohibited by the City's zoning regulations. Because we do not agree that the City's zoning regulations prohibit the construction of condominiums, apartments or other long term arrangements in an RA–1 zone, we reverse.

■ Uses permitted within an RA–1 zone include "a Residential and Resort Hotel," which is defined as:

A building, or associated group of buildings, designed for the entertainment of transients as guests for compensation, the residents of which are not predominately [sic] permanent (in the sense of continuous year-round tenancy), and do not have exclusive possession and control of the rented facilities, and the conveniences and facilities of which include, but not by way of limitation, public dining areas, meeting rooms and facilities, retail outlets, room service and housekeeping and maid services. No more than twenty five percent (25%) of the rooms available for rent shall have cooking facilities.

Cherry Hills Village, Co., City Code § 6–1–1 (1980) (Code). The City has conceded that this definition contemplates the presence of some permanent year-round residents, so long as they do not predominate. Even without this concession, it is obvious that the city council and the court of appeals erred in interpreting this zoning regulation to preclude permanent residents.

A statute or ordinance should be construed so as to give effect to every word, and a construction should not be adopted which renders a word superfluous. *See Colorado General Assembly v. Lamm,* 700 P.2d 508 (Colo.1985). An interpretation of this ordinance which precludes permanent residents makes the words "predominantly" and "residential" superfluous. To prohibit permanent residents, the definition need simply have stated "the residents of which are not permanent." The inclusion of the word "predominantly," indicates that permanent residents were contemplated, but that they could not predominate over the transient guests. Further, the term "residential and resort hotel" itself implies that something more was contemplated than a hotel for transient guests.

The City suggests that the long-term residences contemplated by the ordinance must be rooms or suites in the hotel, rather than the separate "luxury residences" proposed by the Developer. It argues that the language "no more than twenty five (25%) of the rooms available for rent shall have cooking facilities" manifests an intent to restrict the long-term units to hotel rooms with kitchen facilities.

First, nothing in the quoted sentence precludes the development of separate apartments or condominiums. Moreover, the zoning history of this tract of land indicates that the city council's predecessor, the Board of Trustees, intended to allow the development of separate year-round residences when it created the RA–1 zone. When the original "residential and resort hotel" complex was proposed in 1957, the plans included apartments as part of the complex. Finally, the minutes of the January 20, 1958 meeting of the Board of Trustees state that "[t]he Trustees asked to have hotel, apartment and apartment hotel included in the definitions in the proposed ordinance." Although these terms were not included in the definition, this suggests that the term "residential and resort hotel" was intended to include apartments as a permissible use.

The City next argues that the "luxury residences" portion of the development plan was properly rejected because the permanent residences predominated over the hotel portion of the plan. The plan provided for residences ranging in size from 2000 to 5000 square feet, as compared to the hotel rooms, which would measure 450 square feet each. However, the predominance requirement in the ordinance clearly speaks to the number of residents, rather than to the area of the various units. The record contains no evidence which would indicate that the 200 proposed permanent residences would house more residents than the 600 proposed hotel rooms. Absent such evidence, there is no support for the contention that the residential portion of the development plan would predominate over the hotel portion of the plan.

■ Finally, the City argues that even if permanent residences are permitted, condominiums are impermissible under § 6–1–1 because the residents of condominiums have "exclusive possession and control of the rented facilities." In support, the City cites the provisions of the Colorado Condominium Ownership Act to show that exclusive possession and control of the air space is a dominant feature of condominium ownership. However, the very definition of a condominium requires the existence of an undivided interest in common elements. § 38–33–102, 16A C.R.S. (1982). Thus, a condominium owner cannot have exclusive possession and control of the facilities.

### III

In addition to the two conditions discussed in Part II, the city council imposed eighteen other conditions and restrictions which placed significant restraints on the Developer. Of these eighteen conditions, the trial court found nine totally invalid, and one partially invalid, and ordered the city council to delete them from the resolution approving the second development plan. The court of appeals declined to review the propriety of these conditions because it would be premature. The Developer argues that the court of appeals erred in refusing to review the remaining conditions. We agree.

The court of appeals determined that because the proposed condominium development was not a permitted use in an RA–1 district, there was no need to address the remaining conditions "as there was [sic] ample grounds for the City to reject Developer's proposal." It is clear from this statement that the court of appeals misapprehended the posture of this case. The city council did not reject the Developer's proposal. Rather, it approved the project, but attached the disputed conditions to its approval. Because the court of appeals reversed the trial court's invalidation, in whole or in part, of twelve of the conditions, the Developer may now proceed with the project only if it complies with all of the city council's conditions. Thus, we agree that the propriety of the imposed conditions should have been addressed on appeal.

This litigation began in 1982. Since then, it has twice been before the court of appeals and it is now before us for the second time. The propriety of the imposed conditions has been fully briefed and argued by both parties in this court. Therefore, in the interest of judicial economy, we choose to review the trial court's invalidation of the city council's conditions ourselves rather than remand the cause to the court of appeals for further proceedings.[1]

The Developer contends that the trial court properly invalidated ten of the imposed conditions on the grounds that the city council exceeded its jurisdiction and abused its discretion. We agree.

■ Cherry Hills Village, Co., City Code § 6–11–4 (1980), states that:

No building permit shall be issued for any construction within an RA–1 Resort Area District until complete plans are approved (which approval shall not be unreasonably withheld) by the City Council, with the advice of the Planning and Zoning Commission, after consideration of the compatibility of the proposed plans with the City's Master Plan, this Title, and existing structures and uses in the neighboring area.

In reviewing the Developer's plan, the city council imposed the following conditions and restrictions which were subsequently invalidated by the trial court:

A. The building heights shall not exceed those represented to the City by the Developer, i.e.: chimney—90 feet, highest roof line—80 feet; restaurant—70 feet.

B. Recreational facilities shall include not less than nine tennis courts, one swimming pool, one outdoor skating rink, health club. and nine-hole executive type golf course.

C. Parking facilities shall include underground parking for at least 1,150 vehicles, and surface parking for not more than 370 vehicles.

E. To assist in alleviating traffic congestion, improvements acceptable to the City and the State Highway Department shall be provided at the intersection of South University Boulevard and East Hampden Avenue, with the Developer providing the funding therefor in the amount of not less than Five Hundred Thousand Dollars ($500,000) as represented by the Developer.

F. The nine-hole golf course shall as proposed be provided generally at the northwest area of the project.

H. Sound and view impacts upon adjacent residential properties shall be mitigated by the use of landscaping, berming and other acceptable devices. It is required that the Developer negotiate directly with each individual adjoining property owner to arrive at the most suitable and acceptable plan to minimize to the extent reasonably possible adverse sound and view impacts resulting from the project.

---

**1.** In its opening brief, the Developer fully argued the propriety of the imposed conditions. In its answer, the City stated that in the interest of judicial economy, it would respond to the Developer's arguments on the merits so as to allow resolution of the issue of the conditions. Further, in oral argument, both parties argued the merits of the imposed conditions, and the City indicated that it was willing to argue the merits of the issue because, after seven years of litigation, it would like to see the case concluded. Therefore, it appears that neither party will be prejudiced by our decision to review the propriety of the conditions.

L. Developer shall submit to the City satisfactory evidence of its financial ability to perform and complete the entire project.

M. As claimed by the Developer the proposed resort hotel shall be of the highest quality comparable to the Mobil Five–Star designation.

N. Retail outlets shall be of the highest quality appropriate to the Mobil Five–Star hotel designation.

R. Developer shall provide all funds required for additional fire equipment necessitated as a result of the project, as may be reasonably determined by the Cherry Hills Fire Protection District.[2]

Conditions E and R require the Developer to fund certain public improvements as a condition to approval of the plan. It is within the police power of a municipality to impose on a developer the burden of providing reasonable improvements to public facilities made necessary by a development as a condition of approval of that development. *Beaver Meadows v. Board of County Comm'rs*, 709 P.2d 928 (Colo.1985); *Bethlehem Evangelical Lutheran Church v. City of Lakewood*, 626 P.2d 668 (Colo. 1981). The exercise of such power, however, must be guided by land use regulations which are sufficiently specific to guide the city council's discretion. *Id.*

For example, in *Bethlehem Evangelical Lutheran Church v. City of Lakewood*, 626 P.2d 668 (Colo.1981), we upheld the City of Lakewood's action in conditioning a building permit on the construction of certain public improvements. The city had an ordinance which expressly allowed such a condition upon a finding that the improvements were necessitated by the proposed construction, and were related to the public safety of the user of the sidewalks and streets. Further, the ordinance required

that the improvements meet certain legislatively adopted specifications, thus circumscribing Lakewood's discretion as to the nature and extent of the improvements that could be required.

█ Here, although the zoning regulations and the master plan evidence an intent that the city council consider the effect of development on traffic congestion and fire protection, the regulations provide no guidance as to how any negative effects caused by the development must be alleviated. Absent such guidelines, the City's land use regulation is insufficient to provide "all users and potential users of land with notice of the particular standards and requirements imposed by the [City] for [development plan] approval." *Beaver Meadows*, 709 P.2d at 936. Further, there are not sufficient standards to "ensure that any action taken by a [city] in response to a land use proposal will be rational and consistent and that judicial review of that action will be available and effective." *Id.* at 936. Consequently, the trial court correctly deleted conditions E and R from the city council's resolution.[3]

█ In the absence of a statute or ordinance granting authority to do so, a municipality may not impose conditions upon the approval of a development plan. *Beaver Meadows v. Board of County Comm'rs*, 709 P.2d 928 (Colo.1985). If a plan meets all of the zoning requirements and authority to impose additional conditions or criteria to guide such authority is lacking, the plan must be unconditionally approved. *Sherman v. Colorado Springs Planning Comm'n*, 763 P.2d 292 (Colo.1988); *Bauer v. City of Wheat Ridge*, 182 Colo. 324, 513 P.2d 203 (1973); *Western Paving Constr.*

---

2. The trial court also construed Condition Q, which stated "[a]ll capital or public improvements, including within limitation traffic signals and devices, shall be at the sole expense of the Developer," to apply only to those improvements constructed within the 68.8 acre project. Because the City did not specifically claim error on appeal or on certiorari review, and because the Developer made no objection, we do not address the propriety of the trial court's action.

3. In its brief, the City concedes that the city council exceeded its authority in imposing condition E, but maintains that a letter from Buell in 1958 supports the imposition of condition R. However, because the Code did not contain sufficient criteria, and because the Developer did not agree to take on this responsibility in its development plan, we find that condition R was improper.

*Co. v. Board of County Comm'rs*, 181 Colo. 77, 506 P.2d 1230 (1973).

■ Conditions A, B, F, M, and N simply require the Developer to carry through with the representations it made in its development plan. Although we agree with the trial court that there is no independent authority in the zoning code or the City's master plan which would support the imposition of these conditions, we hold that the City was not foreclosed from adopting the conditions because the Developer had included them within its plan.[4]

Condition C addresses the parking facilities required by the City. The trial court held that the condition was more restrictive than was required by the Code, and thus the condition was arbitrary. Cherry Hills Village, Co., City Code § 6–15–1 (1980), sets out the City's required parking facilities for new developments. The Code requires off-street parking for each use conducted on the land, according to a specific formula included in the ordinance. Applying these criteria to the specifications provided by the Developer in the development plan, the Code requires that 1,374 parking spaces be constructed.[5] The city council has only required the Developer to provide 1,150 parking spaces, which are to be underground. Although surface parking was limited to an additional 370 spaces, the Developer was not required to create such spaces. Therefore, the city council's condition was proper in terms of the number of parking spaces.

Again, although the City cannot impose the requirement that 1,150 of the parking spaces be underground because nothing in the Code or the master plan authorizes such a condition, the City may impose such a requirement because of the Developer's plan.[6]

■ The trial court found that the first sentence of condition H was appropriate, but that the requirement that the Developer negotiate directly with adjoining property owners constituted an abuse of discretion. The City has conceded that this part of condition H is invalid. We agree that the second sentence of the condition unlawfully delegates the city council's authority to those property owners whose property adjoins the property at issue in this case, and is therefore invalid. *Frankel v. City & County of Denver*, 147 Colo. 373, 363 P.2d 1063 (1961).

Finally, neither the Code nor the master plan provided the city council with authority to impose condition L, which requires the Developer to submit evidence of its ability to complete the entire project. The City has conceded that this condition should not have been imposed. Therefore, the trial court correctly found that the condition was arbitrary and an abuse of discretion.

Accordingly, the judgment of the court of appeals is reversed, and the case is remanded to the court of appeals with directions to return the case to the district

4. The city council also required "[f]ull and complete compliance by the Developer with all representations, assurances, and proposals set forth in the [development plan] submitted to the City, except for those inconsistent with this Resolution" in Condition J. The trial court found that this requirement was a valid condition under Ordinance No. 2, Series of 1970. Because the trial court's approval of this condition was not appealed, the Developer is still bound to comply with its representations in the development plan.

5. The Code requires one parking space for each unit of a dwelling or resort hotel, thus requiring 800 parking spaces for this project. Further, one parking space is required for every four seats in an eating or drinking facility. The project's eating and drinking facilities are comprised of 875 seats, which mandates an addi-

tional 218 parking spaces. The Code also requires one parking space per every 100 square feet of meeting space in an auditorium or other place of assembly. Because the proposed hotel includes 30,000 square feet of meeting space, another 300 parking spaces are necessary. Finally, one parking space is required for every 200 square feet of retail space. The proposed project has 11,200 square feet of such space, requiring 56 parking spaces. Thus, according to the specifications of the development plan, 1,374 parking spaces are necessary to comply with the Code.

6. In the development plan, the Developer indicated that 1,150 parking spaces would be underground. Thus, the Developer is still bound by this representation pursuant to condition J. *See supra* note 4.

court for further proceedings not inconsistent with this opinion.