855 P.2d 805 (1993)
The STATE of Colorado, for the Use of the DEPARTMENT OF CORRECTIONS, Petitioner,
v.
Federico PEÑA, Mayor of the City and County of Denver; J.D. MacFarlane, Manager of Safety, City and County of Denver; John Simonet, Director of Corrections for the City and County of Denver; Mose Trujillo, Warden of the Jail for the City and County of Denver; Sal Carpio, Robert Crider, Kathy Donohue, Stephanie Foote, Ted Hackworth, Nieves McIntyre, Kathy Reynolds, William Roberts, William Scheitler, John Silchia, and Paul Swalm, City Council Members, City and County of Denver, Respondents.
No. 92SC240.
Supreme Court of Colorado, En Banc.
July 6, 1993.
*806 Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Paul Farley, Deputy Atty. Gen., John August Lizza, First Asst. Atty. Gen., Paul S. Sanzo, Asst. Atty. Gen., Denver, for petitioner.
Daniel E. Muse, City Atty., Stan M. Sharoff, Asst. City Atty., Denver, for respondents.
Justice LOHR delivered the Opinion of the Court.
This case arises as a result of the difficulties encountered at both the state and county levels due to a lack of available prison space for the housing of state-sentenced prisoners, the General Assembly's attempt to compensate any county or city and county for the expense of housing state prisoners, and the refusal of the City and County of Denver (Denver) to accept "technical" parole violators from the State.

I
The relevant facts are undisputed. In 1985, the General Assembly sought to provide partial reimbursement to any county or city and county housing state-sentenced prisoners pending transfer to state correctional facilities. To that end, the legislature passed section 17-1-112(1), 8A C.R.S. (1986) (the prison reimbursement statute), which provided that subject to appropriations, the Colorado Department of Corrections (DOC) would pay any county or city and county $16 per day per prisoner, subject to certain limitations not relevant here.[1] At the same time, the General Assembly appropriated for the fiscal year beginning July 1, 1985, an additional $886,950 to the DOC for it to carry out its duties under article 1 of title 17, Colorado Revised Statutes. See ch. 340, sec. 2, 1985 Colo. Sess.Laws 1339, 1339-40.
Denver, which was then housing state prisoners, billed the DOC for payments under the prison reimbursement statute and continued to do so at all times relevant to this dispute. However, the DOC ceased making payments to Denver, even though money originally appropriated by the General Assembly for such payments was still available. Finally, on April 16, 1986, the General Assembly amended its previous appropriation of $886,950 by reducing it to $216,928, thereby "disappropriating" $670,022 in unspent funds which would otherwise have been available to the DOC to compensate counties such as Denver for the housing of state prisoners.[2]See ch. 7, sec. 2, 1986 Colo.Sess.Laws 155, 160.
*807 At the same time, the problem of prison overcrowding was increasing. Both the DOC and Denver were struggling to meet the demands for housing the increasing numbers of offenders, but with inadequate resources to do so. Due to the DOC's inability to house all offenders sentenced to its facilities, state prisoners remained in county jails following sentencing until the DOC was capable of housing them in the state prison system.[3] This placed added strains on the Denver County Jail. Consequently, Denver initiated a policy whereby it refused to accept "technical" parole violators[4] brought to it for temporary housing.[5]
On May 1, 1986, parolee William Espinoza was arrested by two parole officers in Denver and transported to the prearraignment detention facility at the Denver County Jail. The facility refused to accept him, asserting that Espinoza was a technical parole violator and that due to a new Denver policy, such offenders would no longer be accepted by the Denver County Jail. The next day, the DOC filed a petition in Denver District Court to compel Denver to accept accused parole violators pending revocation proceedings. On May 14, 1986, Denver counterclaimed, seeking $16 per day pursuant to the prison reimbursement statute for each state prisoner housed in the Denver County Jail.[6]
*808 On September 28, 1987, the trial court entered an order that required the DOC to remove all state prisoners from the Denver County Jail and that prohibited further backlogging of state prisoners at that facility. Those rulings were not appealed. The trial court additionally held that (1) Denver was not obligated to accept technical parole violators and (2) Denver was entitled to a judgment in the amount of $835,136 as compensation for housing state-sentenced prisoners pursuant to the prison reimbursement statute.[7] On October 19, 1987, the trial court stayed the enforcement of that judgment pending appellate review.
The Colorado Court of Appeals affirmed the judgment of the trial court, State ex rel. Dep't of Corrections v. Peña, 837 P.2d 210, 213 (Colo.App.1992), and we granted certiorari to decide the following issues:
Whether the court of appeals erred in affirming the district court's judgment against the state department of corrections in favor of the city of Denver in the amount of $835,136.
Whether the court of appeals erred in affirming the district court's ruling that the Denver County Jail is not required to receive alleged parole violators who are awaiting revocation hearings.

II
We first address the question of whether it was error to enter judgment in the amount of $835,136 in favor of Denver based on the prison reimbursement statute. In answering this question, two distinct issues are raised. The first is essentially an issue of judicial powerwhether a trial court has the authority to enter a judgment against the state in the absence of an appropriation by the General Assembly to satisfy that judgment. The second concerns whether the court of appeals and the trial court properly relied on the prison reimbursement statute in awarding a judgment in favor of Denver. We address each issue in turn.

A
The DOC argues that since the money originally appropriated for payments under the prison reimbursement statute had been disappropriated prior to the trial court's ruling, the court lacked the power to enter a judgment pursuant to that statute. The basis of this argument is that the General Assembly has the absolute power over appropriations, subject only to constitutional limits, see Colorado General Assembly v. Lamm, 700 P.2d 508, 519 (Colo. 1985), and that the judicial branch can neither order an agency to make expenditures nor order the General Assembly to make funds available for a particular purpose. The DOC concludes that because there were no funds appropriated to satisfy the judgment entered in favor of Denver at the time the trial court entered that judgment, the judgment cannot stand, as it violates the principle of separation of powers set forth in article III of the Colorado Constitution.[8]
The court of appeals rejected the DOC's argument, concluding that the considerations raised by the DOC "concern[ ] collection of the judgment, rather than merely its imposition." Peña, 837 P.2d at 212. Accordingly, the court of appeals affirmed *809 the trial court's ruling, holding that Denver was entitled to a judgment for housing state prisoners at the rate of $16 per day per prisoner irrespective of whether the General Assembly had made the funds available to satisfy this award. We agree with the court of appeals that the concerns raised by the DOC are relevant to the question of the satisfaction of the judgment entered in favor of Denver, and not the trial court's power to enter such a judgment.
In Goebel v. Colorado Department of Institutions, 764 P.2d 785 (Colo.1988), we addressed the question of whether a class action suit that challenged the adequacy of the mental health care provided by the Colorado Department of Institutions and the Denver Department of Health and Hospitals was properly dismissed by the trial court. The State contended that "had the trial court ordered the implementation of the remedial plan, its intervention in a resource allocation decision would have violated the separation of powers doctrine." Id. at 799. We rejected the State's separation of powers argument and stated:
After the trial court approved the defendants' plan, it could have directed them to implement it until the appropriated funds ran out. The defendants then would have had the obligation to bring to the legislature's attention the inadequacy of the funding to satisfy the plaintiffs' rights. To the extent that the required services could not be provided in some manner not requiring additional funding, and to the extent that the necessary appropriations to provide the required services were not forthcoming, the court would not be able to order and implement full relief.

Id. at 801 (citation omitted) (emphasis added).
Thus, we clearly indicated that a court has the power to enter a judgment that in order to be fully implemented might require an additional appropriation by the General Assembly. We noted, however, that in such a case the defendants would be required to request the necessary appropriation, and that if such funds were not made available, "the court would not be able to order and implement full relief," id., because it would be prohibited from ordering an appropriation by the General Assembly. See Colorado General Assembly, 700 P.2d at 519-20. In short, Goebel stands for precisely the proposition that the court of appeals relied on in affirming the judgment of the trial court: The separation of powers argument advanced by the DOC goes to the collection, and not to the entry, of the judgment. Consequently, we hold that it was not error for the trial court to enter a judgment against the DOC that in order to be fully implemented would require an additional appropriation by the General Assembly, which the trial court would be powerless to order.

B
Having determined that the trial court had the power to enter judgment against the DOC and in favor of Denver, we turn to the question of whether the trial court properly applied the prison reimbursement statute as the basis for that judgment.
The prison reimbursement statute provides:

Subject to appropriations, the department [of corrections] shall reimburse any county or city and county, in an amount of sixteen dollars per day to maintain a prisoner in a jail of the county or city and county, for the expenses incurred by that county or city and county in the confinement and maintenance of any person who is sentenced to a term of imprisonment in a [state] correctional facility and who is confined in a local jail. Such reimbursement shall be for each day following seventy-two hours after such sentence but prior to the transmittal of the qualified person to a [state] correctional facility.
§ 17-1-112(1), 8A C.R.S. (1986) (emphasis added). Although on its face this statute appears to create an unqualified legal right on the part of certain local governments to receive compensation for the housing of state prisoners, the State argues that the effect of the phrase "[s]ubject to appropriations" is to make that legal obligation contingent *810 upon an appropriation and thereafter continually contingent upon the decision of the General Assembly not to disappropriate previously appropriated funds. In other words, according to the State, as soon as the General Assembly disappropriated the relevant funds in this case, the State was no longer legally obligated to compensate local governments for the housing of state prisoners either before or after the date of that disappropriation.
We initially observe that in ordinary language there is nothing in the phrase "[s]ubject to appropriations," § 17-1-112(1), to suggest that it limits a legal right rather than a practical remedy. In addition, if the General Assembly had intended under certain circumstances to limit the legal right of local governments to reimbursement for the housing of state prisoners, and thereby to transfer to local governments more of the cost of housing various state prisoners, the General Assembly had absolutely no need to equivocate. This is so because as the State itself correctly points out to us in its brief the General Assembly has the power to compel a county to perform services for the State at the county's expense. See Colorado State Bd. of Social Servs. v. Billings, 175 Colo. 380, 384, 487 P.2d 1110, 1112 (1971); People ex rel. Hershey v. McNichols, 91 Colo. 141, 146-49, 13 P.2d 266, 268-69 (1932). Hence, insofar as the phrase "[s]ubject to appropriations" means anything in section 17-1-112(1),[9] its most likely function is to make explicit the intent of the General Assembly that satisfaction of obligations to local governments for housing state prisoners would be dependent on future appropriations.
This interpretation of the phrase "[s]ubject to appropriations" is also required by our analysis of an essentially similar phrase in Goebel, 764 P.2d at 788-801. In part IIB(2) of Goebel, we interpreted certain provisions of the Colorado Act for the Care and Treatment of the Mentally Ill, §§ 27-10-101 to -127, 11 C.R.S. (1982 & 1986 Supp.) (Care and Treatment Act). See Goebel, 764 P.2d at 788, 798-801. The Care and Treatment Act provided that its purposes were "subject to available appropriations," § 27-10-101 (emphasis added), and in particular that:
Any person receiving evaluation or treatment under any of the provisions of this article is entitled to medical and psychiatric care and treatment ... suited to meet his individual needs, and delivered in such a way as to keep him in the least restrictive environment subject to available appropriations.

Ch. 210, sec. 4, § 27-10-116(1)(a), 1986 Colo.Sess.Laws 1010, 1011 (emphasis added). An important issue in part IIB(2) of Goebel was whether persons had a right under section 27-10-116(1)(a) to medical and psychiatric care and treatment absent available appropriations for that care and treatment. See Goebel, 764 P.2d at 800-01. We held that the phrase "subject to available appropriations," although it was newly added to numerous provisions of the Care and Treatment Act by a recent and specific amendment, see ch. 210, secs. 1-4, §§ 27-10-101, -107, -109, -116, 1986 Colo.Sess. Laws 1010, 1010-11 (Senate Bill 120), did not affect the substantive right to medical and psychiatric care and treatment granted to persons by section 27-10-116(1)(a). Goebel, 764 P.2d at 800-01. Specifically, we held that
[i]t is only the implementation of the right [to care and treatment] that is made subject to available appropriations.... Senate Bill 120 does not limit the substantive rights provided under the Care and Treatment Act, but does explicitly restrict the remedies available for the fulfillment of those rights.
Id. at 801 (citations omitted). Accordingly, we acknowledged that to the extent services required under section 27-10-116(1)(a) could not be provided without an additional appropriation, and to the extent such an appropriation was not forthcoming, a "court would not be able to order and implement full relief [under section 27-10-116(1)(a)]." Id. Nevertheless, we also *811 held that those responsible for administering the Care and Treatment Act would have "the obligation to bring to the legislature's attention the inadequacy of the funding," id., the State would still have a duty under section 27-10-116(1)(a) to provide such services, and the failure to do so would constitute a violation of the Care and Treatment Act.
We perceive no relevant important difference between the statutory structures in question in Goebel and in this case.[10] Therefore, following Goebel, as well as adopting the most natural reading of the prison reimbursement statute, we hold that Denver had the right under section 17-1-112(1) to receive reimbursement from the DOC for expenses that it incurred for the housing of state prisoners both before and after the April 16, 1986, disappropriation. More specifically, we hold that the addition of the phrase "[s]ubject to appropriations" in section 17-1-112(1) did not affect the substantive right of local governments such as Denver to receive reimbursement for the housing of state prisoners. Rather, only the implementation of Denver's right was made subject to available appropriations. Furthermore, we hold that to the extent appropriations necessary to cover the expenses incurred by the DOC under section 17-1-112(1) are not forthcoming, a "court [will] not be able to order and implement full relief." Goebel, 764 P.2d at 801. Nevertheless, the DOC would have "the obligation to bring to the legislature's attention the inadequacy of the funding," id., the State would still have a duty under section 17-1-112(1) to pay for the housing of state prisoners, and the failure to do so would constitute a violation of section 17-1-112(1).[11]

III
The court of appeals next held that the trial court correctly determined that the Denver County Jail was not required to accept technical parole violators pending revocation hearings.
The DOC first argues that this ruling is contrary to the purpose of section 17-2-103(1)(e), 8A C.R.S. (1986). That section provides the authority for a parole officer to arrest a parolee for any violation of the conditions of parole.[12] We agree with the *812 DOC that the authority conferred is broad. We cannot accept the DOC's argument, however, that this section defines a county's or city and county's obligation to accept technical parole violators, because it says nothing about the obligations imposed on any county or city and county with respect to those parole violators. Consequently, we disagree with the DOC that section 17-2-103(1)(e) supports a conclusion different from that reached by the court of appeals and the trial court.
The DOC also argues that the plain language of section 17-2-103(4)(a), 8A C.R.S. (1986), mandates that a county or city and county accept all alleged parole violators who are arrested. That section provides that if a parolee is arrested "the parolee shall be held in a county jail pending action by the parole officer...." The DOC argues in its opening brief that this section was intended by the General Assembly to enable a parole officer to "deliver any alleged parole violator to whichever county jail is most convenient under the circumstances and that the jail lacks discretion to refuse to hold the prisoner pending further parole proceedings."
Although we agree with the DOC that a parole officer has both the right to arrest a parole violator and the right to take that parolee to a county jail for detention, we do not agree that these rights entail a corresponding duty on the part of those jails to accept, without any discretion whatsoever, such parolees. To the contrary, the statutory authority relied on by the DOC is simply silent on the question of a county's obligation to accept parolees pending a revocation hearing, and we decline to read into it an absolute duty to accept parolees.
The DOC maintains, however, that recognizing the right to detain parole violators in a county jail without recognizing a corresponding duty on the part of every county jail to accept them would lead to irrational and absurd results. The DOC posits the possibility that all county jails could simultaneously refuse to accept parole violators and thus a parole officer would have no place to take a parole offender for detention. While such a development would obviously be undesirable, we have no way of assessing the likelihood of such an occurrence.[13]
In contrast to this hypothetical problem presented by the DOC, there was a very real problem of overcrowding at the Denver County Jail.[14] Consequently, there was *813 a very real possibility that if Denver were required to accept any parole violator tendered to itirrespective of the gravity of the offense committed and, more importantly, without regard for its ability safely to accommodate such an offenderit could have been forced to release certain offenders properly incarcerated so as to make the space necessary to accept any parolee tendered to it. Denver would have been forced to choose which detainees to release in order to accommodate the alleged technical parole violators, and the anomalous consequence could have been that prisoners who posed a much greater threat to public safety would have been required to be released. Alternatively, if a county jail in an overcrowded situation like the one that existed in Denver has no discretion in accepting technical parole violators, and that jail declines to release those already held in custody, the result could be that the safety, health, and morale problems attendant upon severe overcrowding would become so intolerable that the jail simply would become uninhabitable.
Either way, the Denver County Jail found itself in a position analogous to the situation at issue in State Bd. of Corrections v. City and County of Denver, 61 Colo. 266, 156 P. 1100 (1916). In State Bd. of Corrections, Denver brought a mandamus action against the Colorado Board of Corrections, seeking to compel the authorities at the State Asylum for the Insane to receive and care for certain persons designated as insane. The Board defended on the ground that those patients could not be accommodated at the state hospital due to overcrowding. We held that in spite of a court order committing the patients to the asylum, id. at 280, 156 P. at 1104, the asylum was justified in refusing to accept those persons it was incapable of properly housing. We stated:
The law does not require that which is impossible.... It cannot reasonably be said that the legislature intended to confer upon courts the arbitrary power to compel the admission of patients to such an institution, without capacity to receive them, or without the means to care for them, regardless of the welfare of the inmates in the institution, or those sought to be admitted.
If the buildings and equipment of the asylum were to be burned, the power of the courts, would still exist, and ... the superintendent would be compelled to receive additional patients, notwithstanding there was no place for them; or that the twelve hundred so deprived of shelter and care, were without place to lay their heads.
Id., at 280-81, 156 P. at 1104.
While State Bd. of Corrections might be distinguishable from the present case on any number of grounds, its reasoning provides further support for our refusal to impose a duty on counties to accept, without any discretion whatsoever, all parole violators tendered to them.
Thus, in light of the absence of any statutorily mandated requirement that every county jail accept every parole violator tendered to it by the DOC, and the practical difficulties inherent in so requiring, we hold that the court of appeals properly concluded that the Denver County Jail had no obligation to accept every technical parole violator brought to it.[15]

IV
For the foregoing reasons, we affirm the judgment of the court of appeals.
ROVIRA, C.J., concurs in part and dissents in part, and VOLLACK, J., joins in the concurrence and dissent.
Chief Justice ROVIRA concurring in part and dissenting in part:
The majority concludes that the phrase "subject to appropriations" contained in *814 section 17-1-112(1), 8A C.R.S. (1986) ("the prison reimbursement statute"), does "not affect the substantive right of local governments such as Denver to receive reimbursement for the housing of state prisoners," maj. op. at 811, but only limits the "practical remedy" that may be available for a violation of the prison reimbursement statute. The majority reaches this conclusion on the grounds that (1) it conforms with "the most natural reading" of the statute and (2) is mandated by our decision in Goebel v. Colorado Department of Institutions, 764 P.2d 785 (Colo.1988). Maj. op. at 809-811. In my opinion neither the plain meaning of the prison reimbursement statute nor our decision in Goebel mandates the majority's conclusion. Additionally, based on the language of the prison reimbursement statute and the legislative history underlying its enactment, the phrase "subject to appropriations" was clearly intended to create a conditional entitlement in any city or city and county for reimbursement for the housing of state-sentenced prisoners and not, as the majority holds, a right in those entities that may, as a practical matter, be without a remedy. Accordingly, I respectfully dissent from Part II(B) of the majority opinion.

I
The General Assembly originally appropriated $886,950 in order to cover the anticipated payments that would come due under the prison reimbursement statute for the fiscal year beginning July 1, 1985. See ch. 340, sec. 2, 1985 Colo.Sess.Laws 1339, 1339-40. On December 20, 1985, after distributing $216,928 for the housing of state-sentenced prisoners under the prison reimbursement statute, the Department of Corrections ("DOC") ceased providing payments to the City and County of Denver ("Denver"), although Denver continued to bill the DOC for housing those prisoners. Approximately four months later, on April 16, 1986, the General Assembly "disappropriated" all remaining funds ($670,022) originally appropriated for payments under the prison reimbursement statute, but which had not been distributed by the DOC. See maj. op. at 806 n. 2.
Denver sought a damage award against the DOC in the amount of $835,136 which was based on Denver's housing of state-sentenced prisoners and parolees from September of 1985 through July of 1987 and represents the difference between the amounts billed and the amounts paid by the DOC.[1] The trial court entered judgment in favor of Denver in that amount, and the court of appeals affirmed.
The DOC challenges this award on the grounds that it cannot be obligated to pay Denver the statutorily prescribed amount of reimbursement once the funds necessary to do so are no longer available. The DOC concludes therefore, that any money claimed by Denver pursuant to the prison reimbursement statute that remained unpaid by the DOC after the General Assembly's disappropriation on April 16, 1986, can neither be claimed nor owed.
Thus, in determining whether the court of appeals erred in affirming the trial court's entry of judgment, the question is whether Denver is entitled to receive payments under the prison reimbursement statute irrespective of whether the General Assembly has appropriated the funds necessary to make such payments. More specifically, we must determine whether the phrase "subject to appropriations" limits the ability to enforce a right to reimbursement that otherwise exists (as the majority holds), or whether this language indicates that no right is created by the prison reimbursement statute for compensation by the DOC.

II
When interpreting a statute, our starting point is the language of the statute itself, which should be given its plain and ordinary meaning. Thiret v. Kautzky, 792 P.2d 801, 806 (Colo.1990).
*815 The prison reimbursement statute provides:
(1) Subject to appropriations, the department shall reimburse any county or city and county, in an amount of sixteen dollars per day to maintain a prisoner in a jail of the county or city and county, for the expenses incurred by that county or city and county in the confinement and maintenance of any person who is sentenced to a term of imprisonment in a correctional facility and who is confined in a local jail. Such reimbursement shall be for each day following seventy-two hours after such sentence but prior to the transmittal of the qualified person to a correctional facility.
§ 17-1-112, 8A C.R.S. (1986).

A
The phrase "subject to" is defined as "liable, subordinate, subservient, inferior, obedient to; governed by or affected by; provided that; provided; answerable for." Black's Law Dictionary 1425 (6th ed. 1990). Accordingly, in MacManus v. Love, 179 Colo. 218, 221, 499 P.2d 609, 610 (1972), this court observed that "subject to constitutional limitations," the General Assembly's power over appropriations is plenary. This observation was made in the course of holding that a statute which forbade the Governor from spending federal funds violated article V, section 32 of the Colorado Constitution. In short, we used the phrase "subject to"in its plain and ordinary senseas imposing a precondition on the ability of the legislature to exercise its otherwise absolute power of appropriations. Which is to say, of course, that the General Assembly's power over appropriations is not absolute, but subject to constitutional constraints. See Burgess Constr. Co. v. M. Morrin & Son Co., Inc., 526 F.2d 108, 113 (10th Cir.1975) ("the words `subject to' usually indicate a condition to one party's duty of performance") (citing 17 Am.Jur.2d Contracts § 320 (1964)) cert. denied, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).
In spite of the plain meaning of the phrase "subject to appropriations," the majority simply asserts that "in ordinary language there is nothing in the phrase `[s]ubject to appropriations,' ... to suggest that it limits a legal right rather than a practical remedy." Maj. op. at 809-810. The majority offers no authority in support of this proposition yet concludes that "insofar as the phrase ... means anything ... its most likely function is to make explicit the intent of the General Assembly that satisfaction of obligations to local governments for housing state prisoners would be dependent on future appropriations." Id. at 810.
I, however, believe that the plain language of the statute mandates that the DOC is obligated to pay any county or city and county for the housing of state-sentenced prisoners only if the necessary funds have been appropriated to do so. On this reading, any county or city and county enjoys only a conditional entitlement ("subject to appropriations") to compensation for housing state prisoners as opposed to a right for which there may be no remedy.[2]
In my judgment, the plain language of the statute provides a sufficient basis for reaching this conclusion. If, however, some ambiguity in the phrase "subject to appropriations" remains, the legislative history unmistakably puts to rest any lingering doubts as to its intended meaning.
House Bill 1385 was originally passed by the House without the language "subject to appropriations." Rather, the bill provided simply that "[t]he department shall reimburse any county or city and county in an amount of sixteen dollars per day...." When H.B. 1385 was considered by the Senate Judiciary Committee, however, concern was expressed about the mandatory language of the bill as passed by the House.
Senator Jeffrey M. Wells inquired whether H.B. 1385 provided that the department "shall pay $16 per day subject to appropriations, and once we run out of [the money appropriated] are we obligated for $16 per *816 day thereafter or is it only to the extent of appropriations?" The Chairman of the Senate Judiciary Committee replied, "that will always be the case." Senator Wells then responded that "what I don't want to see is after running out of [monies appropriated] having Pueblo County then sue us for its $16 for each day thereafter saying it has statutory authority saying we're entitled to it, thereby we have to appropriate it to cover it."[3] The Chairman replied that such restrictive language was not presently in the bill, but that he was sure that the limiting language could be added without objection. The Chairman then inquired as to "what would be the case law on that." Senator Wells replied, "I really don't know."[4] The phrase "subject to appropriations" was then added by the unanimous vote of the judiciary committee and, with this amendment intact, eventually became codified as section 17-1-112.
This legislative history is entirely consistent with what the plain language of the prison reimbursement statute indicates. The phrase "subject to appropriations" signifies that the statute creates no absolute right to $16 per day per prisoner to any county or city and county but rather, evinces an attempt by the General Assembly to help any county or city and county defray the costs of housing state prisoners in their facilitiesif the requisite funds are appropriated. In my opinion, it is only after such an appropriation has been made that the DOC's mandate that it "shall reimburse any county or city and county" becomes effective. § 17-1-112, 8A C.R.S. (1986) (emphasis added). The legislative history indicates that the phrase "subject to appropriations" was included in the prison reimbursement statute precisely to avoid any confusion over whether the General Assembly was creating an unconditional right in any county or city and county for reimbursement from the state when it attempted to defray the cost of housing state-sentenced prisoners.
The majority concludes, however, that Denver is entitled to $835,136 under the prison reimbursement statute based on the assumption that the phrase "subject to appropriations" has no relevance to the question of whether Denver has a right to $16 per day per prisoner.[5] I disagree. Reading the prison reimbursement statute in this way effectively disregards the phrase "subject to appropriations" and conflicts with both the language of the statute and the legislative history of its enactment.

B
The majority also holds that its reading of the phrase "subject to appropriations" is "required by our analysis of an essentially similar phrase in Goebel, 764 P.2d at 788-801." Maj. op. at 810. In Goebel we reviewed *817 a ruling of the trial court which held, among other things, that the Colorado Act for the Care and Treatment of the Mentally Ill, §§ 27-10-101 to -127, 11 C.R.S. (1982 & 1986 Supp.) ("Care and Treatment Act"), created a statutory right to appropriate treatment. Goebel, 764 P.2d at 790-91. We observed, however, that the General Assembly, in response to this ruling of the trial court, had passed Senate Bill 120, which amended the Care and Treatment Act by introducing the language "subject to available appropriations" in numerous sections of the act. Thus, the question presented in Goebel required us "first [to] address the question of whether any legally enforceable rights to care and treatment were created by the Care and Treatment Act and then consider the effect of Senate Bill 120 on any such rights." Id. at 796.
We concluded first, that the Care and Treatment Act, prior to its amendment by Senate Bill 120, provided rights to both voluntary and involuntary patients, based on "the language of the act and the legislative intent expressed in [section] XX-XX-XXX." Id. at 797. We then turned to the question of whether Senate Bill 120, which inserted the phrase "subject to available appropriations," "deprived the trial court of jurisdiction to protect the class members' rights." Id. at 800. We reached the conclusion that the trial court retained jurisdiction to approve and implement a remedial plan by noting that
[t]he amended act not only retains the "right to treatment" provision upon which the court based its finding of a statutory right, but also clarifies and reinforces that right by making explicit reference to the mental health services particularized in section 27-1-201(1)(a) to (1)(e) and in rules and regulations authorized by section 27-1-202. It is only the implementation of the right that is made subject to available appropriations.... Senate Bill 120 does not limit the substantive rights provided under the Care and Treatment Act, but does explicitly restrict the remedies available for the fulfillment of those rights.
Id. at 800-01.[6]
As any fair reading of Goebel makes clear, we concluded that the right created by the Care and Treatment Act was retained in spite of the insertion of the language "subject to available appropriations," because the statutory provisions originally relied on in concluding that such a right existed had not been deleted from the act.[7] In short, the impact of the phrase "subject to available appropriations" with respect to the right at issue was based not on the meaning of that phrase, but on the import previously attributed to other statutory language which supported our initial conclusion that the act created a right. Indeed, the significance that the majority places on Goebel is striking in light of the fact that we never ventured an opinion in Goebel regarding what the phrase "subject to available appropriations" meant. To the contrary, we simply concluded that the phrase did not limit the substantive right that had previously been created by the *818 Care and Treatment Act, because the language of the act that created that right was left intact by Senate Bill 120.
Thus, given the factual distinctions between the Care and Treatment Act and the prison reimbursement statute, as well as the rather conspicuous absence of any affirmative statement regarding the meaning of the phrase "subject to available appropriations" in Goebel, I am of the opinion that Goebel in no way mandates the result reached by the majority.

III
For the above stated reasons, I am of the view that the mandate of the prison reimbursement statute, i.e., "the department shall reimburse," becomes operative only when the necessary appropriations have been provided for such reimbursement. Consequently, the court of appeals erred in affirming the trial court's entry of judgment in favor of Denver in the amount of $835,136. It does not follow from my analysis, however, that Denver should not be entitled to receive any compensation under the prison reimbursement statute. To the contrary, Denver should receive reimbursement for its housing of state-sentenced prisoners during the period of time in which funds were appropriated by the General Assembly for such payments. As noted above, the legislature originally appropriated $886,950 for housing state-sentenced prisoners. Initially, the DOC made payments to Denver in accordance with the statutory mandate. Prior to the disappropriation of those funds on April 16, 1986, however, the DOC had ceased providing payments to Denver, though Denver continued to submit bills for reimbursement. The DOC's failure to make payments to Denver while the funds were appropriated is in conflict with the obligatory language of the prison reimbursement statute, which mandates that "[s]ubject to appropriations, the department shall reimburse...." § 17-1-112, 8A C.R.S. (1986) (emphasis added).
Thus, the award to Denver under the prison reimbursement statute should be reconsidered in a manner which gives effect to both the limiting language of the statute (i.e., "subject to appropriations....") as well as the mandatory provision of that statute (i.e., "the department shall reimburse....").[8]
Accordingly, I respectfully dissent from Part II(B) of the majority opinion.
I am authorized to say that Justice VOLLACK joins in this concurrence and dissent.
NOTES
[1] The prison reimbursement statute has since been amended three times. First, it was amended to increase the amount of compensation to be paid by the DOC from the original $16 to $40. See ch. 124, sec. 9, § 17-1-112(1), 1988 Colo. Sess.Laws 707, 710. Then it was amended to permit the DOC to contract with local authorities, subject to available appropriations, to compensate them for the housing of state prisoners at a rate not to exceed $60 per day per prisoner. See ch. 3, sec. 4, § 17-1-112(1), 1989 Colo.Sess. Laws 18, 20 (1st Ex.Sess.). Finally, the prison reimbursement statute was amended to provide that subject to appropriations the DOC shall reimburse any county or city and county in an amount equal to the sum of "[t]he audited expense for such local jail multiplied by the number of days of confinement of such state prisoner in such local jail ... and ... [a]ny extraordinary costs incurred in confining and maintaining such state prisoner in such local jail." See § 17-1-112(1)(a) & (b), 8A C.R.S. (1992 Supp.). None of these amendments applies to this controversy.
[2] The director of the Division of Management and Development for the DOC stated in an affidavit that the DOC stopped making payments to counties for the housing of state prisoners on December 20, 1985, and that prior to that time a total of $216,928 was "expended to county jails." An assistant director of that same division testified that out of this total of $216,928, Denver received $7,392.

The April 16, 1986, disappropriation of funds for the reimbursement of county jails was apparently the result of events that began in October of 1985 when a revenue shortfall for the fiscal year 1985-86 was projected. Specifically, because of the anticipated shortfall, the Governor issued an October 2, 1985, Executive Order that directed the State Controller to restrict 2% of the general fund appropriation of each department of the state and to place these funds in a restricted reserve account. The Office of State Planning and Budgeting later suggested to the Governor as one of several options that up to $470,000 remaining to fund the prison reimbursement statute be transferred to the reserve account. Finally, the General Assembly decided to disappropriate the $670,022 in unspent funds originally appropriated for the compensation of county jails.
We further note that the DOC, which is an executive department, and the General Assembly, in which the legislative power of this state is vested, Colo. Const. art. V, § 1, are not adversaries in this proceeding, and the power of the General Assembly to "disappropriate" funds previously appropriated and under the control of the executive is not an issue upon which we granted certiorari in this case. Whether funds once appropriated can be disappropriated or whether instead they come irrevocably under the control of the executive on initial appropriation, see Anderson v. Lamm, 195 Colo. 437, 442, 579 P.2d 620, 623 (1978); People ex rel. State Hospital v. Armstrong, 104 Colo. 238, 244, 90 P.2d 522, 525 (1939), is therefore a question on which we express no opinion.
[3] The record reflects that the average length of stay for such prisoners in county jails was 8 to 12 weeks.
[4] Denver classified technical parole violators as those not charged with additional criminal activity, but who violated certain conditions of their parole, such as failing to report to their parole officer or failing to obtain approval for a change of residence.
[5] At a hearing on the State's request for a temporary restraining order that would require the Denver County Jail to accept technical parole violators brought to it for temporary housing, the trial court found that the Denver County Jail was rated to provide safe housing for 600 to 650 inmates, but it was holding over 1,000 prisoners. The trial court also found that "overcrowding at the Denver County Jail ... ha[d] created a dangerous and explosive atmosphere."

Eleven months later, after a hearing on Denver's request for a preliminary injunction to require the DOC to remove state prisoners from the Denver County Jail, the trial court found that "[t]he facts of this case are not new. Indeed, they seem to vary from the facts presented eleven months ago ... in degree only." The trial court then recounted testimony that in light of overcrowded conditions, the Denver County Jail was lucky that during the previous summer months there was no riot. The court concluded:
There is no obligation [on the part of Denver] to show that there was a riot last week or last summer. The only obligation is to show that there is a danger of real and immediate irreparable injury [if the court does not grant the preliminary injunction], and the Court finds that there is that danger....
[6] On April 14, 1987, Denver filed a second amended counterclaim in which it asserted for the first time under a theory of quantum meruit a claim for the value of its care and custody of state prisoners. The trial court rejected Denver's quantum meruit claim and relied solely on the prison reimbursement statute to support the judgment under review, and the Colorado Court of Appeals affirmed the denial of quantum meruit relief. State ex rel. Dep't of Corrections v. Peña, 837 P.2d 210, 213 (Colo.App.1992). Denver did not seek certiorari review of that part of the court of appeals' judgment. Because the quantum meruit claim is not before this court, we express no opinion regarding it.
[7] This judgment was based on the statutory rate of $16 per day per prisoner for Denver's housing of state-sentenced prisoners and parolees from July of 1985 through July of 1987. During that time, the actual cost per day to house an inmate at the Denver County Jail was $49.
[8] Article III of the Colorado Constitution provides:

The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.
[9] A court in interpreting a statute must strive to avoid a construction that renders any word superfluous. E.g., Cherry Hills Resort Dev. Co. v. City of Cherry Hills Village, 790 P.2d 827, 830 (Colo.1990); Colorado General Assembly, 700 P.2d at 517.
[10] The "subject to available appropriations" language at issue in Goebel was added to the Care and Treatment Act by amendment rather than being included in the statute as originally enacted. In contrast, the prison reimbursement statute included the "[s]ubject to appropriations" phrase when the statute was originally enacted. If it were generally the case that the very same language that is insufficient to affect a substantive legal right when it is added by specific amendment is sufficient to prevent the creation of that legal right when it is inserted from the beginning, then our analysis of "subject to available appropriations" in Goebel would probably not control our analysis of "[s]ubject to appropriations" in this case. However, we are aware of no authority for the proposition that the same language that is insufficient to affect a substantive legal right when it is added by specific amendment is sufficient to prevent the creation of that legal right when it is inserted from the beginning, and it can hardly be said that this proposition is self-evident. We therefore read Goebel as direct authority for the result reached in this part IIB despite the fact that "[s]ubject to appropriations" appeared in the prison reimbursement statute as originally enacted.
[11] Although it is unnecessary to resort to legislative history to divine the meaning of the prison reimbursement statute, we note that our interpretation of its accords with its legislative history. Specifically, in a hearing before the Senate Judiciary Committee, Senator Wells expressed the following concern regarding the prison reimbursement statute: "I guess what I don't want to see is when we run out of [monies appropriated] having Pueblo County then sue us [the General Assembly] for its $16 per day for each day thereafter saying it has statutory authority saying we're entitled to it, thereby we have to appropriate it to cover it" (emphasis added). This indicates that Senator Wells' concern was the ability of a local government to prevail in a lawsuit, thereby forcing the General Assembly to make an appropriation. By following Goebel's interpretation of "subject to available appropriations," this concern is effectively satisfied because Goebel makes it clear that although the phrase "subject to available appropriations" does not limit substantive rights, it "does explicitly restrict the remedies available for the fulfillment of those rights." Goebel, 764 P.2d at 801.
[12] § 17-2-103(1)(e) provides:

(1) The director of the division of adult services, an assistant director, or any parole officer may arrest any parolee when:
....
(e) He has probable cause to believe that the parolee has violated a condition of his parole or probable cause to believe that the parolee is leaving or about to leave the state, or that the parolee will fail or refuse to appear before the board to answer charges of violations of one or more conditions of parole, or that the arrest of the parolee is necessary to prevent physical harm to the parolee or another person or to prevent the commission of a crime.
[13] At the hearing on the State's request for a temporary restraining order, the trial court found that in the five months preceding the State's filing of this lawsuit, only "some eight cases of parole violations involving so-called technical or pure parole violations have occurred." The trial court also found that during this time "other jails in the metro area[, such as the Adams County Jail, were] available to take those types of prisoners [i.e., technical parole violators] without resulting in an overcrowding of these other county jails." The trial court concluded "[s]o we are not talking about a great hardship on the part of the State of Colorado."
[14] While this case was being tried in September of 1987, and as part of the evidence that it received, the trial court personally viewed the Denver County Jail. The trial court recounted that view as follows:

The Court was advised during that view that what it was seeing was the day-to-day operation of that facility and was advised that the number of 1,240 that had been testified to the day before was perhaps 1,247 inmates that were actually at the county jail when the Court was there.
The Court's observations included that prisoners at the Denver County Jail are bunked everywhere. What formerly were day rooms, where prisoners could get away from the sleeping area, no longer exists because those day rooms are now filled with bunks. And when I say "bunks," I'm not indicating single, I mean double bunks. Old office space, which had been used for a period of time as offices, do not exist anymore because they are now full of bunks.
In the more secure parts of the Denver County Jail, the Court observed that there were two men per cell. Those cells were six feet by nine feet; 54 square feet, 27 square feet per man.
....
The problems at the Denver County Jail are evident. Physically, the Denver County Jail, if it continues to grow at the rate it has grown since April, in terms of population, will soon be out of space. Not out of secure space, not out of cells, out of space period. The jail, in short, is full.
See also supra note 5.
[15] We decide only the question of a county's obligation to accept technical parole violators (as defined by Denver, see supra note 4), and express no opinion regarding the duty, if any, to accept other state-sentenced prisoners for incarceration.
[1] The record reflects that the difference between the amount billed by Denver and the amount paid by the DOC was $505,574 for fiscal year 1985-86; $247,562 for fiscal year 1986-87; and $82,000 for July 1, 1987 through July 31, 1987.
[2] Such an entitlement is to be contrasted to a right which exists independently of appropriations, but which can only be effectuated by virtue of an appropriation.
[3] As for the majority's conclusion that its holding accords with the concern of Senator Wells, maj. op. at 811 n. 11, two points seem relevant. First, though the Senator was concerned with a local government's ability to force the General Assembly to make an appropriation ("thereby we have to appropriate it to cover it") it does not follow that Senator Wells' other concern ("what I don't want to see is ... having Pueblo County then sue us ... saying it has statutory authority saying we're entitled to [reimbursment]....") is one which this court may properly eschewparticularly when that concern is expressed with as much clarity as it is here. Secondly, the fact that the Chairman inquired as to the "statutory case law" on the language "subject to appropriations," and that Senator Wells responded in the manner he did, suggests that the concerns of the Senator did not pertain solely to a local government's ability to force the General Assembly to make an appropriation, since it is the Constitution, and not case law, which grants the legislature plenary power over appropriations, see art. V, § 33, and we ordinarily presume that the legislature acts with full knowledge of relevant constitutional provisions. Smith v. Miller, 153 Colo. 35, 39, 384 P.2d 738, 740 (1963).
[4] Our decision in Goebel v. Department of Institutions, 764 P.2d 785 (Colo.1988), which the majority places so much emphasis on, was decided approximately three years after the prison reimbursement statute was first enacted.
[5] The majority holds that had the General Assembly intended "to limit the legal right of local governments to reimbursement for the housing of state prisoners, the General Assembly had absolutely no need to equivocate." Maj. op. at 810. I agree with this statement, however in my opinion, it supports exactly the opposite conclusion than that reached by the majoritythe General Assembly had no need, nor did it, equivocate.
[6] Justice Vollack, joined by Justice Erickson, dissented to Part II(B)2 of the majority opinion on the grounds that

Senate Bill 120 was a response to the trial court's invitation to the General Assembly to make "crystal clear" its intent concerning availability of monetary relief for violation of the Care and Treatment Act. The title of Senate Bill 120, though not controlling supports the view that the General Assembly intended to limit monetary relief to the amount of available appropriations.
Goebel, 764 P.2d at 811 (Vollack, J., concurring in part and dissenting in part).
[7] The difference between determining the import of this phrase in the context of statutory scheme that is found to already create a substantive right (as with the Care and Treatment Act) as opposed to a statutory scheme where no such right has yet been found (as is the case here), is obscured by the majority when it states "that in ordinary language there is nothing in the phrase `[s]ubject to appropriations' ... to suggest that it limits a legal right rather than a practical remedy," maj. op. at 809-810, and by concluding "that the addition of the phrase ... did not affect the substantive right of local governments such as Denver to receive reimbursement for the housing of state prisoners." Maj. op. at 811. It is my opinion the issue before us is whether the prison reimbursement statute creates such a right. The majority's analysis, from beginning to end, seems to assume that such a right exists.
[8] While the record before us reveals that the General Assembly appropriated and later disappropriated funds for payment under the prison reimbursement statute for fiscal year 1985-86, we cannot ascertain what amounts were appropriated for such payments during fiscal year 1986-87 and the period from July 1, 1987 through July 31, 1987. The record also does not reveal whether any funds appropriated during those times were later disappropriated by the General Assembly. The trial court's judgment in favor of Denver, however, was based on payments "owed" from June 1, 1985 through July 31, 1987. Therefore, in my judgment the case should be remanded to the trial court in order to determine the availability of appropriations for all times relevant to this dispute so as to demarcate the time periods for which Denver should be entitled to payment under the prison reimbursement statute.